# IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | Case No. 25-16599-KHT |
| | ) | |
| SPYRIDON TSAPARAS, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |

## NHC LLC'S MOTION TO DISMISS BANKRUPTCY CASE

NHC LLC ("NHC") moves (the "Motion") to dismiss the bankruptcy case of Spyridon Tsaparas ("Tsaparas"), and states as follows:

## I.      INTRODUCTION

1.      Since September 23, 2019, NHC and Tsaparas have been engaged in litigation in the United States District Court for the Northern District of Illinois (the "District Court"), after NHC discovered that Tsaparas and the other Judgment Debtors[1] had committed fraud on, and essentially stolen millions of dollars from, NHC. *See NHC LLC v. Centaur Constr. Co.*, Case No. 19-cv-06332 (N.D. Ill. Sept. 23, 2019) (the "Underlying Litigation").

2.      Tsaparas' efforts to avoid complying with his obligations are well documented. United States District Court Judge Matthew F. Kennelly, the Judge presiding over the Underlying Litigation, has already found that Tsaparas has engaged in a deliberate strategy to "[s]tall, delay, [and] do nothing" in an effort to avoid complying with Judge Kennelly's orders and paying his obligation to NHC.[2] (Ex. 1 at 23:13–15.) Unfortunately, this finding is not unique. Judge Kennelly has repeatedly noted Tsaparas' failure to comply with court orders and questionable litigation

---

[1] The term "Judgment Debtors" refers to Tsaparas, Peter Alexopoulos ("Alexopoulos"), and Centaur Construction Company Inc. ("Centaur").

[2] A true and correct copy of a portion of the transcript of the August 7, 2024 hearing in the Underlying Litigation is attached hereto as **Exhibit 1**.

tactics, including:

- refusing to produce documents in response to citations to discover assets and then objecting to the extension of the citations by improperly arguing "don't extend the citation because I didn't produce the thing that I was supposed to produce before."[3] (Ex. 2 at 38:2–8.)

- making legal arguments that are "not even borderline plausible[,]" "ridiculous[,]" "absurd[,]" and "frivolous, or nearly so."[4] (Ex. 3 at 5:14–19; Underlying Litigation, ECF No. 521 at 2.)

- presenting the same argument to the District Court "three and four times" in order to engage in "a strategy in this case to basically just keep papering the case and keep filing stuff over and over again so that nothing ever happens." (Ex. 1 at 4:20–24.)

- making statements and advancing positions which literally cause the District Court to "laugh[] out loud" or are "facially absurd."[5] (Ex. 1 at 22:15–16; Ex. 4 at 12:5–10.)

- causing the District Court to reference, multiple times, the possibility that Tsaparas would be incarcerated based on failure to comply with District Court orders.[6] (Ex. 5 at 11:18–24, 18:23–25.)

3.      To be clear, NHC is not *arguing* that Tsaparas has engaged in a campaign of improper conduct, information concealment, and contemptuous disregard of court orders in a deliberate and calculated attempt to thwart NHC's collection efforts. Instead, NHC is *stating facts*. The District Court has already found, among other things, that Tsaparas has "committed contempt of court *about three dozen times*" by systematically dissipating assets in violation of District Court

---

[3] A true and correct copy of portions of the transcript of the December 20, 2023, hearing in the Underlying Litigation is attached hereto as **Exhibit 2**.

[4] A true and correct copy of portions of the transcript of the March 26, 2024, hearing in the Underlying Litigation is attached hereto as **Exhibit 3**.

[5] A true and correct copy of portions of the transcript of the April 23, 2024, hearing in the Underlying Litigation is attached hereto as **Exhibit 4**.

[6] A true and correct copy of portions of the transcript of the September 30, 2024, hearing in the Underlying Litigation is attached hereto as **Exhibit 5**.

orders. Moreover, the District Court has found that Tsaparas failed to provide NHC with required financial information which can explain where more than $1.2 million *in cash withdrawals* went to over the past several years.[7]

4.      This bankruptcy case is the latest effort by Tsaparas to avoid complying with, among other things, his payment and disclosure obligations in the Underlying Litigation, which are antithetical to the Bankruptcy Code. For example, prior to this bankruptcy case, Tsaparas structured an "employment agreement" with his "dear friend[]," pursuant to which Tsaparas' unsecured debts to his friend were forgiven provided Tsaparas remain employed in his friend's company. Not only could Tsaparas artificially reduce his income (and assets available to creditors), but he allowed his friend—an unsecured creditor—to be repaid over a secured creditor. Incredibly, this arrangement was not disclosed on Tsaparas' schedules and statements. Because this bankruptcy case is nothing more than an instrumentality for Tsaparas to continue hiding his assets and avoiding his obligations in the Underlying Litigation, the Court should dismiss this case.

## II.      JURISDICTION AND VENUE

5.      The Court has jurisdiction over the Bankruptcy Case pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

6.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[7] A recent production of text messages between Tsaparas and a third-party underscores Tsaparas' open distain for the Underlying Litigation and his refusal to comply with the District Court's orders. In those text messages (attached hereto as **Group Exhibit 6**), Tsaparas accuses Judge Kennelly of doing things he is "not allowed to order by law" and entering "unlawful" and "illegal" orders against him. Tsaparas also has the audacity to accuse Judge Kennelly of being "compromised." Tsaparas should not be permitted to utilize this bankruptcy case as another means of ignoring his obligations in the Underlying Litigation or in an apparent effort to forum-shop.

7.      The predicate for the relief requested herein is section 707(a) of title 11 of the United States Code (the "Bankruptcy Code").[8]

## III.   FACTUAL BACKGROUND

### A.   The Underlying Litigation.

8.      Tsaparas and Alexopoulos were/are the principals of Centaur.[9] (Ex. 7 at 653:11–12.) In late 2017, NHC purchased the land on which the Nobu Hotel Chicago ("Nobu Hotel Project") was being developed. Centaur was ultimately retained as the general contractor. After NHC paid Centaur tens of millions of dollars to complete the Nobu Hotel Project, NHC learned that Judgment Debtors were engaged in a fraudulent scheme in which funds provided by NHC for the Nobu Hotel Project were used for other purposes.

9.      NHC's case was tried to a jury, and on August 18, 2022, the jury returned a verdict in favor of NHC with respect to the fraud count. (Underlying Litigation, ECF No. 208.) That same day, judgment was entered jointly and severally, in an aggregate total amount of $20,437,290.20, plus punitive damages against the Judgment Debtors individually, and in particular Tsaparas in the amount of $1,500,000.00. (*Id.*, ECF No. 209.) Thereafter, on March 15, 2023, the judgment (the "Judgment") was amended and increased to $22,272,124.34, in order to account for pre-judgment interest. (*Id.*, ECF No. 228.)[10] The Judgment has since been upheld on appeal. *See NHC LLC v. Centaur Constr. Co.*, No. 23-1719, 2025 WL 2717628 (7th Cir. Sept. 24, 2025). Since entry of the Judgment, NHC has been attempting to collect on that Judgment and Tsaparas has made every

---

[8] Unless otherwise stated, all references to a section are to the Bankruptcy Code.

[9] A true and correct copy of portions of the August 16, 2022 (Volume 3-B), jury trial transcript in the Underlying Litigation is attached hereto as **Exhibit 7**.

[10] Critically, the Judgment is subject to nondischargeability under section 523.

effort to avoid paying the Judgment or complying with District Court orders.

**B.     NHC's Collection Efforts.**

**1.     NHC issues citations to discover assets.**

10.     In an attempt to collect the Judgment in the NHC Litigation, NHC has served numerous citations to discover assets under 735 ILCS 5/2-1402.[11] NHC served direct citations (a post-judgment tool for Illinois judgment creditors enabling judgment creditors to engage a literal "fishing expedition" to gather information related to judgment debtors' current and/or historical assets) upon Tsaparas, Alexopoulos, and Centaur, and third-party citations upon (among several

---

[11] The legal impact of the issuance of a citation to discover assets is significant. Specifically, "[a] citation [served] upon the judgment debtor grants the judgment creditor an enforceable lien 'upon all personal property belonging to the judgment debtor in possession or control of the judgment debtor.'" *NHC LLC v. Centaur Constr.*, No. 19 C 6332, 2025 WL 1075198, at *3 (N.D. Ill. Apr. 9, 2025) (quoting 735 ILCS 5/2-1402(m)(1)). Illinois law explicitly provides that such lien "binds nonexempt personal property, including money, choses in action, and effects of the judgment debtor." 735 ILCS 5/2-1402. The same section also grants a judgement creditor a lien on property "which may thereafter be acquired or come due to the judgment debtor." *Id.* 735 ILCS 5/2-1402, which is construed liberally, vests courts "with broad powers to compel the application of discovered assets or income to satisfy a judgment" and the related procedures are "largely to the judge's discretion." *Yancheng Shanda Yuanfeng Equity Inv. P'ship v. Wan*, No. 20-2198, 2024 WL 2876920, at *4 (C.D. Ill. Apr. 24, 2024), *report and recommendation adopted in part*, 2024 WL 4468812 (C.D. Ill. Oct. 10, 2024) (citations omitted); *see also NHC LLC*, 2025 WL 1075198, at *3–4 (entering turnover order in favor of judgment creditor and against third party citation respondent that received money from judgment debtor after judgment debtor was served with citation); *NHC LLC v. Centaur Constr. Co.*, No. 19 C 6332, 2025 WL 1547264, at *3–5 (N.D. Ill. May 30, 2025) (directing citation respondent to turn over cash used in violation of citation as a civil contempt penalty).

Importantly, a judgment creditor's prepetition service of a citation to discover assets upon a debtor provides that judgment creditor with a ***perfected lien*** on all the debtor's non-exempt personal property, which lien is superior to (and entitled to priority over) a chapter 7 trustee's lien on such property. *See, e.g., In re Porayko*, No. 09 B 29262, 2010 WL 1253949, at *6 (Bankr. N.D. Ill. Mar. 30, 2010) ("It is now clear under Illinois law that service of a citation to discover assets created a perfected lien on all of the debtor's non-exempt personal property as of the service date." (citing *Cacok v. Covington*, 111 F.3d 52, 54 (7th Cir. 1997)), *aff'd sub nom. Crane v. Porayko*, No. 10-cv-2630, 2012 WL 2702997 (N.D. Ill. July 3, 2012), *aff'd sub nom. In re Porayko*, 705 F.3d 703 (7th Cir. 2013).

others) U.S. Bank, Busey Bank, and Village Bank & Trust. Notably, on May 5, 2023 (well over two years before Tsaparas' bankruptcy filing), NHC served a Citation to Discover Assets upon Tsaparas (the "Tsaparas Citation").[12] (Underlying Litigation, ECF No. 243.) The Tsaparas Citation (and the resulting lien created thereby) has been continued several times, most recently on October 20, 2025. (*Id.*, ECF No. 838.) Thus, the citations to the Judgment Debtors, and numerous third parties, remain in place.

### 2. Tsaparas' *routine* violations of District Court Orders and citation restraining provisions on behalf of himself.

11.     In the months following service of the Tsaparas Citation, Tsaparas made a partial production of responsive documents. Many of these documents were produced only after the District Court granted NHC's various motions to compel. (*See Id.*, ECF Nos. 295, 337.) Although Tsaparas' production was then incomplete, on March 5, 2024, NHC filed a motion for turnover order as to Tsaparas and US Bank Accounts (the "March Tsaparas Turnover Motion"). (*Id.*, ECF No. 351.) The March Tsaparas Turnover Motion outlined a multitude of instances in which Tsaparas had violated the restraining provision of the Tsaparas Citation. (*Id.* ¶¶ 16, 18.)

12.     On April 23, 2024, following briefing and a hearing on the March Tsaparas Turnover Motion, the District Court issued an oral ruling on the March Tsaparas Turnover Motion and found that "Tsaparas made numerous transfers in violation of the citation and the lien imposed by the citation. The total of those is in the neighborhood of $400,000." (Ex. 4, at 5:3–6.) The District Court further found that Tsaparas has "committed contempt of court about three dozen times" by systematically violating the restraining provision imposed by the Tsaparas Citation. (*Id.* at 8:1–2.)

---

[12] NHC also served a citation on Centaur (the "Centaur Citation"). (Underlying Litigation, ECF No. 309.)

13.     Following the April 23, 2024 ruling, NHC obtained additional documents in response to third-party citations. Based on a review of those documents, NHC learned that Tsaparas had continued to violate the restraining provisions of the Tsaparas Citation and the District Court's April 23, 2024, ruling by spending another $72,252.24 in just *two months*. (Underlying Litigation, ECF No. 592, ¶¶ 8–9.) The bulk of those funds were spent by Tsaparas on car leases, hotels, payments to his purported personal assistant, payments to his attorneys, and cash withdrawals. (*Id*.) During this time period and despite the existence of the Judgment and the restraining provision of the Tsaparas Citation, Tsaparas and his co-habitating domestic partner, Corri McFadden, own/owned multiple vehicles and resided in a 5,462 square foot mansion in Aspen, Colorado, with an estimated value of over $10 million.

14.     Based on this newly discovered information, on June 21, 2024, NHC filed another motion for rule to show cause as to why Tsaparas should not be held in contempt (the "June Tsaparas Contempt Motion"). (*Id*., ECF No. 437.) Thereafter, on July 12, 2024, the District Court entered its "Order Regarding Certain Post-Judgment Matters" (the "July 2024 Contempt Order").[13] (Ex. 8.) Among other things, in the July 2024 Contempt Order the District Court "found Spiro Tsaparas in contempt due to his repeated and extensive violations of the restraining provisions of the citation to discover assets that was served upon him." (*Id*.) Moreover, the District Court found that Tsaparas' arguments did not "make any sense" (*id*. at 11), "border[ed] on the ridiculous" (*id*. at 12), and were "[n]onsense" (*id*.). Judge Kennelly ultimately likened Tsaparas to a thief that was arguing "he's free to keep stealing because its [sic] not clear how much he will have to pay back and when." (*Id*.)[14] Additionally, the July 2024 Contempt Order required Tsaparas to make monthly

---

[13] A true and correct copy of the July 2024 Contempt Order is attached hereto as **Exhibit 8**.

[14] Moreover, it the May 15, 2025 Order, copy of which is attached hereto as **Exhibit 9**, Judge Kennelly found that Tsaparas has "continually shifted [his] factual statements concerning [his]

installment payments of $25,000 to NHC, starting on July 30, 2024 and "to file with the Court . . . an accounting **under penalty of perjury** listing his monthly income and expenditures (including any payments on the judgment and on this installment order), as well as his assets at current market value[.]" (the "Monthly Accounting") (*Id.* at 3 (emphasis added).) Tsaparas' refusal to comply with District Court orders continued with respect to these obligations.

15.     With respect to his monthly installment payment obligation, Tsaparas made no payments.

16.     With respect to his Monthly Accounting obligation, Tsaparas engaged in further procedural gamesmanship. Specifically, Tsaparas either failed to timely file his Monthly Accountings *or* he filed incomplete Monthly Accountings which omitted various withdrawals Tsaparas made from his various bank accounts. (*See* Underlying Litigation, ECF No. 592, ¶¶ 16–23 (detailing the information Tsaparas omitted from his Monthly Accountings, made under the pains and penalties of perjury).) As the District Court found in its May 30, 2025, Memorandum Opinion and Order (the "May 2025 Tsaparas Contempt Order")[15]:

> When all of the unaccounted-for transfers are added up, it appears that Mr. Tsaparas has made, and **failed to disclose, more than $142,000 in personal cash withdrawals**. This is in addition to the undisclosed cash withdrawals that Mr. Tsaparas caused as principal of Centaur, which **total more than $1.2 million**.

(Ex. 10 at 5 (emphasis added).)

---

assets and [has] failed to adequately supplement [his] document productions" and further questioned the veracity of numerous statements made, or positions adopted by, Tsaparas. (Ex. 9.)

[15] A true and correct copy of the May 2025 Tsaparas Contempt Order is attached hereto as **Exhibit 10**.

       3.       **Tsaparas' *routine* violations of District Court Orders and citation restraining provisions on behalf of Centaur.**

17.     The Centaur Citation required Tsaparas (acting on behalf of Centaur) to produce, *inter alia*, detailed financial information dating back five years. (*Id*., ECF No. 309.) At various times, Centaur, Tsaparas, and/or Centaur's counsel claimed that Centaur ceased operations in 2019 and therefore had no responsive documents to produce after that date. In light of NHC's concerns that Centaur's document production was not complete, on or about April 24, 2024, the District Court ordered Centaur to provide a declaration of completeness. (*Id*., ECF No. 389.)

18.     On May 10, 2024, Centaur simply reproduced all of the documents it had produced in response to discovery ahead of trial, but no new documents responsive to the Centaur Citation and nothing additional beyond 2019. Also on May 10, 2024, Centaur submitted a Declaration of Completeness signed under penalty of perjury by Tsaparas, attesting that these documents were "all of the documents within Centaur's possession and/or control that are responsive to the Citation to Discover Assets that was served on Centaur on November 28, 2023."[16] (Ex. 11.)

19.     NHC would later confirm that Tsaparas' representations on behalf of Centaur were false. NHC obtained numerous documents from third-parties and through Freedom of Information Act requests which demonstrated that Centaur continued to operate years after 2019, through ***at least*** 2023. (Underlying Litigation, ECF No. 590, ¶¶ 4–41.) Again, this issue is not debatable, as the District Court in the Underlying Litigation has already found that Tsaparas' repeated representations that Centaur ceased operations and thus had no responsive documents, were false. Specifically, the District Court found:

---

[16] A true and correct copy of the Centaur Declaration of Completeness is attached as **Exhibit 11**.

- Tsaparas had shifted positions and no longer claimed that Centaur ceased operations after 2019[17] (Ex. 12 at 5);

- Instead, Tsaparas now claims that Centaur has no access to responsive documents, since it lost access to a Box.com server storing its responsive documents (*Id*);

- The "veracity" of Tsaparas' citation examination testimony, that Centaur lost access to the server storing its responsive documents, was no longer credible in light of the declaration of Deanna Van Senus, Tsaparas' personal assistant, in which Ms. Van Senus attests that Centaur had access to the Box.com server into 2024 (*Id*);

- Even if Tsaparas' testimony was credible, it would not explain why Centaur does not have access to documents created *after 2020* (*Id*. at 5–6); and

- Tsaparas and Centaur have "offered no explanation for why [Centaur] failed to produce any documents relating to [various] construction projects, many of which occurred after 2020." (*Id*. at 6.)

20.     Moreover, the scant amount of Centaur's bank records that have been produced reveal that during the period from January 1, 2020 (after Centaur supposedly stopped doing business) to November 30, 2024, ***more than $9 million*** flowed through Centaur's bank accounts. (*Id*., ECF No. 590, ¶ 47.) Additionally, between February 16, 2021 and February 24, 2023, Tsaparas and/or Centaur withdrew $1,271,157.38 ***in cash*** from Centaur's various bank accounts. (*Id*. ¶ 50.) Neither Centaur nor Tsaparas have produced any business records that would explain the nature of these transfers or their purpose.

21.     NHC has recently obtained access to the Box.com server which Tsaparas initially denied existed and then denied having access to. A review of the voluminous contents of the server is currently underway.

---

[17] A true and correct copy of the May 30, 2025, Memorandum Opinion and Order (the "May 2025 Centaur Contempt Order") is attached hereto as **Exhibit 12**.

4.       **Tsaparas' *routine* violations of District Court Orders and citation restraining provisions on behalf of Triton Marine Holdings LLC.**

22.       Tsaparas and Alexopoulos have each confirmed that they were or are the sole owners of Triton Marine Holdings LLC ("Triton").[18] (Ex. 13 at 43:7–45:2; Ex. 14 at 50:19–53:2.) NHC, however, has never gotten a straight answer as to Triton's purpose.

23.       During his citation examination, Mark Hunt ("Hunt")[19] testified that Triton was an entity owned by Tsaparas and through which Tsaparas allegedly provided consulting services to M Development.[20] (Ex. 15 at 12:17–13:9.) Specifically, Hunt testified that Triton was hired for consulting services "with a handful of—of construction projects." (*Id*. at 13:9.) Hunt testified that in connection with those consulting services, Triton issued eleven invoices[21] (Group Ex. 16) to M Development and M Sourcing for a cumulative total of $211,538.47. (Ex. 15 at 19:17–20:1.) Curiously, all of these invoices were issued ***after*** the jury's verdict. NHC's analysis of bank records indicates that between December 2020 and November 2022, M Development paid Triton a total of $1,747,356.47.[22] (Ex. 17.)

---

[18] A true and correct copy of portions of Tsaparas' citation examination transcript is attached hereto as **Exhibit 13**. A true and correct copy of portions of Alexopoulos' citation examination transcript is attached hereto as **Exhibit 14**.

[19] Hunt is the principal of M Development, LLC ("M Development"), the original owner of the Nobu Hotel Project. Hunt and Tsaparas describe themselves as "dear friends" and call each other "brothers."

[20] A true and correct copy of portions of Hunt's citation examination transcript is attached hereto as **Exhibit 15**.

[21] True and correct copies of invoices issued by Triton to M Development or M Sourcing are attached hereto as **Group Exhibit 16**.

[22] A summary of bank records indicating payments from M Development to Triton is attached hereto as **Exhibit 17**.

24.     However, following Hunt's citation examination, Tsaparas gave drastically different testimony regarding the alleged purpose of Triton during his citation examination. According to Tsaparas, the "only purpose" of Triton was to own "a vessel that [Tsaparas and Alexopoulos] purchased in Greece." (Ex. 13 at 47:23–48:4.) Tsaparas clarified that Triton "was not in the construction business." (*Id*. at 48:16–18.) Likewise, at Alexopoulos' citation examination, he testified that Triton "did not have anything to do with construction." (Ex. 14 at 51:6–8.) Alexopoulos also testified that Triton was "an entity that was set up with the expectation of trying to explore opportunities in the hospitality sector in Greece." (*Id*. at 51:21–24.)

25.     Incredibly, Tsaparas testified that Hunt's attorneys came up with the idea to pay Tsaparas for work he was performing for M Development through Triton because of the fraud case against him.[23] (Ex. 18 at 64:23–65:11.) However, Hunt's testimony suggests it was Tsaparas' idea to use Triton for Tsaparas' consulting work for M Development. (Ex. 13 at 12:20–13:2.)

26.     In addition to the divergent stories regarding the role of Triton, it is also notable that in June 2022, Centaur began receiving monthly infusions of cash from Triton, with monthly deposits totaling as much as $438,151.00. This continued into February 2023. No documentation has been produced that would explain the nature of these payments.

27.     Moreover, M Development and Tsaparas have never explained why Triton, whether involved in the construction industry or not, was purportedly provided a more than $4.1 million dollar loan from M Sourcing LLC ("M Sourcing") (another entity purportedly owned by Hunt).[24] (Ex. 19.) Hunt testified that he has "gotten into kind of the bad habit of making a bunch

---

[23] A true and correct copy of portions of the January 8, 2025, hearing transcript in the Underlying Litigation is attached hereto as **Exhibit 18**.

[24] A true and correct copy of an Amended and Restated Promissory Note between Triton and M Sourcing is attached hereto as **Exhibit 19**.

of loans to [Tsaparas] over the years" (Ex. 15 at 13:10–25; 14:1–25; 15:1–16.) According to Hunt, the $4.1 million dollar loan to Triton is made up of those same "bunch of loans" he made to Tsaparas over the years. (*Id*.) In other words, the "loan" to Triton is, in reality, the formal documentation of numerous loans made to Tsaparas.

28.     Tsaparas has been and continues to actively repay the loans he received (and which were ultimately documented as a single sham loan to Triton) through his employment agreement with M Sourcing (the "Employment Agreement").[25] Included in the Employment Agreement, is a provision which provides that if Tsaparas remains an employee of M Sourcing for the duration of the Employment Agreement, the loan to "Triton" will be forgiven. (Ex. 20, ¶ 2.2.) In essence, the sham loan to Triton and the Employment Agreement operate to disguise Tsaparas' efforts to pay back Hunt/M Development/M Sourcing through work performed under the Employment Agreement. This arrangement was structured because of the Judgment and in an effort to place monies out of NHC's reach.

### 5.     The District Court orders specific relief to address Tsaparas' misconduct.

29.     NHC filed multiple motions addressing Tsaparas' misconduct, both on behalf of himself and on behalf of Centaur. (Exs. 10, 12.) Following fulsome briefing, on May 30, 2025, the District Court ordered[26] the following relief:

---

[25] A true and correct copy of the Employment Agreement between Tsaparas and M Sourcing is attached hereto as **Exhibit 20**.

[26] In the May 2025 Tsaparas Contempt Order, Judge Kennelly found, among other things, that "Mr. Tsaparas' repeated unaccounted-for transfers blatantly disregarded the District Court's unambiguous commands" and that Tsaparas did not "attempt to justify—or even dispute—these violations." (Ex. 10 at 6.) The District Court went on to note that it has "given Mr. Tsaparas *multiple* opportunities to disclose his own assets. Yet Mr. Tsaparas has continually delayed filing financial disclosures and has omitted important transfers from these disclosures. These violations amount to contempt." (*Id*. at 7) (emphasis in original). The District Court further noted that Tsaparas' "transfers do not appear to be isolated" and that, "if anything. . . indicate a pattern in

- Tsaparas "must disclose and account for, by no later than 14 days from entry of this order, all cash transactions for himself and/or Centaur from January 1, 2019 to the present" (Ex. 10);

- Tsaparas "must turn over all cash withdrawn in violation of the citation since he was served with it, by no later than 14 days from entry of this order" (*Id.*);

- Tsaparas "must pay the balance of the judgment in monthly installments in the amount of at least $25,000" (*Id.*);

- Centaur must transfer to NHC "servers that may contain documents relating to Centaur's business operations or, if Centaur no longer has control or access to these servers, the production of information regarding where the servers are located and who controls them, and a grant of authority to NHC to access these servers" (Ex. 12);

- Centaur must provide "an accounting of all of Centaur's incoming and outgoing payments (including loans and repayments of debt) from January 1, 2020 to present" (*Id.*); and

- Centaur must pay "any amounts revealed in the newly produced documents and/or in the accounting to have been dissipated or improperly transferred" (*Id.*).

30.    To date, Tsaparas has failed to materially comply with the District Court's May 30, 2025 orders. Tsaparas has provided two unsupported excuses for his non-compliance. *First*, Tsaparas argued that he required access to the Box.com server which he previously claimed did not exist. (Underlying Litigation, ECF No. 786.) NHC provided Tsaparas a complete copy of all documents it obtained from Box.com on the week of September 15, 2025. (*Id.*, ECF No. 806.) *Second*, Tsaparas argued that his prior counsel was in possession of certain unidentified documents Tsaparas previously provided, but no longer retained copies of. (*Id.*, ECF No. 786.) According to Tsaparas, he required copies of these documents in order to comply with the District Court's orders, but was unable to obtain the documents from his former counsel. (*Id.*) Unsurprisingly,

---

which Mr. Tsaparas transfers significant sums of money, delays his accounting disclosures, and then fails to disclose certain transfers on those accountings. Rather than isolated occurrences, these transfers are repeated violations of the citation's restraining provision and this Court's accounting order, and they amount to contempt of court." (*Id.* at 8.)

Tsaparas' former counsel told a different story. According to counsel, Tsaparas never requested counsel provide documents to Tsaparas. (*Id*. ECF No. 800, ¶ 2.) However, in an abundance of caution, on or about September 8, 2025, counsel provided Tsaparas "with copies of all documents in its possession, custody, or control which were provided to it" by Tsaparas and several other entities related to Tsaparas. (*Id*. ¶ 5.) Despite receiving the documents he claimed to need in order to comply with the District Court's orders, Tsaparas has failed to provide a substantive accounting on his own behalf or on behalf of Centaur and has failed to turn over the voluminous amounts of cash he withdrew or make monthly installment payments. (*Id*., ECF No. 725.)

31.     On September 28, 2025, the District Court provided Tsaparas "until October 10, 2025 to complete the tasks required in the District Court's May 30, 2025 Orders." (*Id*., ECF No. 820.)

32.     Instead of complying with the District Court's order, on October 10, 2025, and in yet another delay tactic, Tsaparas filed this bankruptcy case.

## IV.     LAW AND ARGUMENT

### A.     Legal Standard.

33.     Pursuant to section 707(a), a "court may dismiss a case under this chapter only after notice and a hearing and only for a cause." 11 U.S.C. § 707(a). Dismissal of a chapter 7 case for cause is a determination committed to the sound discretion of a bankruptcy court and guided by equitable principles. *See In re Herrera*, 554 B.R. 262, 266 (Bankr. D.N.M. 2016) (citing *In re Smith*, 507 F.3d 64, 73 (2d Cir. 2007)). The movant bears the burden of showing "cause" for dismissal of a chapter 7 case. *See In re Piazza*, 719 F.3d 1253, 1266 (11th Cir. 2013). However, once a party calls into question a chapter 7 debtor's good faith in filing his petition, the burden

shifts to the debtor to prove his good faith. *In re Simon*, 666 B.R. 289, 298–99 (Bankr. M.D. Pa. 2025) (citation omitted); *In re Sky Group Int'l, Inc.*, 108 B.R. 86, 90 (Bankr. W.D. Pa. 1989)).

34.     "Cause" for dismissal of a chapter 7 case is broadly described as any reason cognizable to equity power and conscience of court as constituting an abuse of bankruptcy process. *In re Krueger*, 812 F.3d 365, 370 (5th Cir. 2016). For this reason, the bases for cause set forth in section 707(a) are merely illustrative examples and are not exhaustive. *In re Aiello*, 428 B.R. 296, 299 (Bankr. E.D.N.Y. 2010). Courts looking beyond the bases set forth in section 707(a) routinely treat dismissal of a chapter 7 case for bad-faith conduct by the debtor as implicitly authorized by the words "for cause" in the Bankruptcy Code's provision governing dismissal. *In re Campbell*, 634 B.R. 647, 655–56 (Bankr. D.D.C. 2021). Consequently, multiple courts have held outright that a chapter 7 case can be dismissed where there is an absence of good faith by the debtor. *See, e.g., In re Lombardo*, 370 B.R. 506 (Bankr. E.D.N.Y. 2007); *In re O'Brien*, 328 B.R. 669 (Bankr. W.D.N.Y. 2005).

B.     **The Court Should Dismiss This Bankruptcy Case for Cause Under Section 707(a).**

35.     This bankruptcy case, initiated *more than two and a half years* after entry of the Judgment and on the same date Tsaparas was ordered to make payments and provide fulsome accountings to NHC, should be dismissed for bad faith pursuant to section 707(a). "In determining whether there is a lack of good faith in a debtor's bankruptcy filing, an inquiry into the totality of the circumstances must be conducted." *Lombardo*, 370 B.R. at 511. In order to identify the circumstances that are likely to be relevant in such a totality of the circumstances determination, courts have developed a number of multi-factor tests listing examples of conduct that may constitute bad faith. *See Campbell*, 634 B.R. at 654 (citing *Janvey v. Romero*, 883 F.3d 406, 412

(4th Cir. 2018) (citing examples)). As just one example, the *Lombardo* court identified the following fourteen factors commonly considered by courts when evaluating bad faith filings:

(1)     The debtor's manipulations having the effect of frustrating one particular creditor;

(2)     The absence of an attempt to pay creditors;

(3)     The debtor's failure to make significant lifestyle changes;

(4)     The debtor has sufficient resources to pay substantial portion of debts;

(5)     The debtor inflates expenses to disguise financial well-being;

(6)     The debtor is overutilizing protections of the Bankruptcy Code to the conscious detriment of creditors;

(7)     The debtor reduced his creditors to a single creditor in the months prior to the filing of the petition;

(8)     The debtor filed in response to a judgment, pending litigation or collection action; there is an intent to avoid a large single debt;

(9)     The unfairness of the use of chapter 7;

(10)    The debtor transferred assets;

(11)    The debtor is paying debts to insiders;

(12)    The debtor failed to make candid and full disclosure;

(13)    The debts are modest in relation to assets and income; and

(14)    There are multiple bankruptcy filings or other procedural "gymnastics."

*See Lombardo*, 370 B.R. at 512. (citations omitted); *see also In re McGuire-Pike*, No. 14-13365 ta7, 2015 Bankr. LEXIS 2282, at *9–10 (Bankr. D.N.M. July 10, 2015); *In re Yim Kealamakia*, No. 12-31822, 2013 Bankr. LEXIS 2777, at *25–26 (Bankr. D. Utah July 9, 2013). No one factor is determinative. *See Campbell*, 634 B.R. at 654. For this reason, courts have concluded that "bad faith" conduct sufficient to constitute cause warranting dismissal can include "prepetition bad-

faith conduct," *see Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 373 (2007), post-petition

bad faith conduct, or petitions that simply serve no legitimate bankruptcy purpose. *See, e.g.*, *Kelley*

*ex rel. Petters Co. v. Cypress Fin. Trading Co. (In re Cypress Fin. Trading Co.)*, 620 F. App'x

287, 289 (5th Cir. 2015) (per curiam); *Daniels v. Barron (In re Barron)*, 325 F.3d 690, 694–95

(5th Cir. 2003) (Jones, J., concurring). Here, the majority of the above-listed factors

overwhelmingly weigh in favor of dismissal.

### 1. Tsaparas' gamesmanship has been to the detriment of NHC.

36.     Factors 1, 6, 8, 9, and 14 all weigh in favor of dismissal based on Tsaparas'

prepetition misconduct in the Underlying Litigation and the filing of this Bankruptcy Case on the

*same date* Tsaparas was ordered to provide NHC with accountings and assets he dissipated.

Application of these *Lombardo* factors support a finding of bad faith where a debtor files a chapter

7 case solely to frustrate a creditor's collection efforts, and that creditor demonstrates that the

debtor has done so with the "intention to avoid a large single debt based on conduct akin to fraud,

misconduct or gross negligence." *In re Zick*, 931 F.2d 1124, 1129 (6th Cir. 1991). Here, that is

precisely what Tsaparas has done.

37.     NHC is Tsaparas' largest creditor, holding over 95% of the alleged total of

Tsaparas' liabilities.[27] As a result, Tsaparas' prepetition manipulations (i.e., withholding and

concealing documents, ignoring District Court orders, dissipating assets, etc.) all have the effect

of frustrating NHC in particular. Moreover, the timing of the filing of this bankruptcy case also

directly frustrates NHC's collection efforts and appears to have been strategically engineered to

permit Tsaparas to further delay complying with his District Court-ordered obligations in the

---

[27] NHC rejects any assertion that the debt it is owed by Tsaparas is not secured. *See supra* n.11; *contra* Docket No. 1 at 31 (characterizing NHC's debt as unsecured).

Underlying Litigation. Put simply, this bankruptcy case was not filed in response to a sudden financial disaster. Rather, Tsaparas filed this bankruptcy case as a last-ditch effort and in order to delay NHC's collection efforts and to avoid disclosing what Tsaparas has done with millions of dollars in assets, which he has not done in his schedules and statements despite having an obligation to do so under penalty of perjury. (*See* Docket No. 1.) "In a system premised on transparency, this is unacceptable . . . ." *In re EarthSnap, Inc.*, 670 B.R. 49, 57 (Bankr. E.D. Tex. 2025). Tsaparas' conduct warrants dismissal. *See In re Bryant*, 474 B.R. 770 (Bankr. N.D. Fla. 2012) (granting dismissal, determining that the debtor filed the case in response to a judgment and for the sole purpose of avoiding the appurtenant obligation); *In re Piazza*, 451 B.R. 608, 616 (Bankr. S.D. Fla. 2011) (granting section 707(a) dismissal where the debtor filed the case in response to a judgment, pending litigation, or collection action, and the debtor intended to avoid a large single debt).

> **2.     Tsaparas has improperly transferred assets and refused to use his assets to pay the Judgment owed to NHC.**

38.     Factors 2, 4, 10, and 12 all weigh in favor of dismissal based on the assets which were or are available to Tsaparas to pay some portion of his debt to NHC, but which were instead used to enrich Tsaparas. Specifically, the second *Lombardo* factor "focuses on the import of a debtor's failure to try to pay his creditors prior to seeking bankruptcy relief." *In re Gutierrez*, 528 B.R. 1, 18–19 (Bankr. D. Vt. 2014). Courts find a bankruptcy petition subject to dismissal as a bad-faith filing when a debtor has the capacity to repay some debts, yet fails to do so. *See, e.g., Austin v. IRS.*, No. 06-CV-4828 (ENV), 2010 WL 11606823, at *3 (E.D.N.Y. Mar. 31, 2010) (upholding dismissal because the appellant "does not seriously challenge Judge Milton's findings that 95% of his debt was owed to the IRS, that he never attempted to pay the IRS, or that he had the capacity to repay some debts"). As outlined above, Tsaparas and/or Centaur have withdrawn

more than $1.2 million in cash from Centaur's bank accounts. (Underlying Litigation, ECF No. 590, ¶ 50.) There is no reason to believe that a substantial portion of those assets could have been used—*or, if Tsaparas is concealing such assets, can be used*—to satisfy a portion of the Judgment.

39.     Relatedly, "[m]ost instances of dismissal for bad faith filing under section 707(a) involve concealment, misrepresentation, or unexplained transfers to place assets beyond the reach of creditors." *In re Marks*, 174 B.R. 37, 41 (Bankr. E.D. Pa. 1994). Here, there is no doubt that Tsaparas has dissipated assets and is now using this bankruptcy case as a means of defying yet another order in the Underlying Litigation and avoiding his obligation to provide an accounting of where the missing assets are.

40.     Moreover, Tsaparas has failed to make a fulsome disclosure because he has omitted the millions of dollars in loans he received from Hunt and his efforts to re-pay those loans via the provision of his Employment Agreement with M Sourcing. In short, this arrangement operates to take the allegedly unpaid loan amounts off of Tsaparas' salary up front (and before NHC can attach the same), allowing Tsaparas to claim an artificially small salary in the Underlying Litigation and this bankruptcy case. In so doing, Hunt (and M Development/M Sourcing) are improperly "cutting the line" and putting themselves at the front in terms of debt collection priority and repayment, and substantially reducing the amount available to Tsaparas for all other available debts, including the Judgment.

### 3.     Tsaparas has failed to make significant lifestyle changes.

41.     Factor 3 weighs in favor of dismissal based on Tsaparas' continuation of his extravagant lifestyle. In analyzing this factor, courts have focused not on whether the debtor has made any change at all, but rather, on whether the debtor continues, despite mounting financial

distress, to enjoy a lavish or extravagant lifestyle, ultimately at the expense of creditors. *See In re Snyder*, 509 B.R. 945, 951 (Bankr. D.N.M. 2014) (third *Lombardo* factor indicating good faith as "Debtor lives a modest lifestyle"); *In re Baird*, 456 B.R.. 112, 117 (Bankr. M.D. Fla. 2010) ("[T]he debtor made no life-style adjustments or continued living a lavish lifestyle . . . ."). As outlined above, *after* entry of the Judgment, imposition of the restraining provision in the Tsaparas Citation, and following multiple District Court orders commanding him to stop dissipating assets, Tsaparas has still spent hundreds of thousands of dollars. The majority of those funds were spent by Tsaparas on car leases, hotels, payments to his purported personal assistant, payments to his attorneys, and cash withdrawals. (Underlying Litigation, ECF No. 592, ¶¶ 8–9.) Moreover, until recently, Tsaparas resided in a 5,462 square foot mansion in Aspen, Colorado, with an estimated value of over $10 million.[28] Tsaparas' complete failure to make prepetition lifestyle changes and engage in any necessary "belt-tightening" for *years* after entry of the Judgment weighs in favor of dismissal.

> **4.    This bankruptcy case serves no purpose, and dismissal is in the best interest of Tsaparas, his creditors, and the bankruptcy system.**

42.    In addition to the above-enumerated factors, a court's decision to dismiss a case is also guided by general equitable principles. *See In re Nogin Com. LLC*, 670 B.R. 711, 725–26 (Bankr. S.D.N.Y. 2025). This includes whether dismissal would be in the best interest of the debtor, his creditors, and the bankruptcy system. *See Wilk Auslander LLP v. Murray (In re Murray)*, 900 F.3d 53, 58 (2d Cir. 2018) (considering whether "dismissal would be in the best interest not only of the parties but of the bankruptcy system."); *In re Somers*, 448 B.R. 677, 680 (Bankr. S.D.N.Y. 2011) ("In determining whether to dismiss a case under section 707(a), the Court

---

[28] Tsaparas has represented, but never demonstrated, that he recently vacated the rental property in Aspen, Colorado.

must consider 'the interests of both the debtors and creditors' . . . ." (citation omitted)). Here, dismissal is in the best interest of Tsaparas, his creditors, and the bankruptcy system.

*43.* Tsaparas will receive no benefit from this chapter 7 case, nor will he obtain what every chapter 7 covets: a discharge. *See* 11 U.S.C.§ 727(b). Following a jury trial, NHC obtained the Judgment based on Tsaparas' fraud and willful conduct. (*See* Underlying Litigations, ECF Nos. 208, 209.) Because the elements of actual fraud are "virtually identical" to the elements of fraud under section 523(a)(2)(A), the preclusive effect of the Judgment will almost certainly result in a nondischargeable debt. *See Martin v. Hauck (In re Hauck)*, 489 B.R. 208, 213 (D. Colo. 2013); *Newman v. Donnell (In re Donnell)*, Ch. 7 Case No. 10-12517 ABC, Adv. No. 10-1372 ABC, 2011 Bankr. LEXIS 2266, at *6 (Bankr. D. Colo. June 7, 2011) ("Because elements of common law fraud liability under state law are virtually identical to the elements of fraud under § 523(a)(2)(A) of the Bankruptcy Code, proof of the underlying debt is often coincident with proof of nondischargeability under § 523(a)(2)(A)."); *see also Hemp Recovery Co. v. Boyd (In re Boyd)*, Ch. 13 Case No. 22-12455 TBM, Adv. No. 22-1258 TBM, 2023 Bankr. LEXIS 1724, at *32–36 (Bankr. D. Colo. July 10, 2023). Tsaparas scheduled NHC as holding a claim for $22,272,124.00, even this inaccurate number represents 92.8% of all claims. (Docket No. 1 at 31, 33.) Tsaparas cannot discharge the bulk of his debts—more than $22.2 million—in this bankruptcy case, thus defeating the purpose of filing for chapter 7 in the first place: "to provide an honest debtor with a fresh start." *In re Asset Resol. Corp.*, 552 B.R. 856, 862 (Bankr. D. Kan. 2016) (citation omitted).

*44.* All the while, Tsaparas will waste what little money he claims to have fighting for something he will never receive. Tsaparas claims his monthly take-home pay is $1,629.21 and his expenses are $12,650.00. (Docket No. 1 at 37, 39.) According to Tsaparas, he loses $11,020.79 per month. (*Id.* at 39.) Yet, Tsaparas has spent nearly three months' pay filing this bankruptcy

case, and will incur significantly more costs fighting this Motion, a stay relief motion, and a nondischargeability action. (*Id.* at 12.) Again, Tsaparas is spending money with no hope of obtaining a discharge. (*Cf. Murray*, 900 F.3d at 61 (stating dismissal is appropriate where debtor "did not want or need a discharge[.]").)

45.     Additionally, dismissal will have no impact on Tsaparas' creditors. According to Tsaparas, there will be no funds available to creditors. (Docket No. 1 at 6.) Tsaparas scheduled $13,625.75 in assets, all of which he claims are exempt. (*Id.* at 18–24.) Tsaparas did not file this bankruptcy case with the intention of repaying his creditors, and dismissal will not alter this outcome. Even if there were assets available to creditors, NHC would receive the lion's share of those assets. Although the Debtor scheduled NHC as an unsecured creditor, NHC has a perfected lien on all non-exempt personal property on account of the citations issued under Illinois law. (*See supra* n.11.) Moreover, if the Trustee recovered avoidance actions or other unencumbered assets, then NHC would still receive 95.4% of such assets. (*See* Docket No. 1 at 31, 33.) For all intents and purposes, outside of NHC, "there [are] no other creditors to protect." *Murray*, 900 F.3d at 61.

46.     Finally, the bankruptcy system as a whole is advanced by dismissal. Tsaparas cannot articulate a single reason how this bankruptcy case serves the interest of the bankruptcy system. Tsaparas did not file this bankruptcy case for his or his creditors' benefit. He did so to avoid providing NHC with information related to his assets, which is the very information Tsaparas is required to provide in this bankruptcy case. Tsaparas filed this bankruptcy case solely as a dilatory tactic, and it is nothing more than "the most recent battlefield in a long-running, two party-dispute" which should be resolved in the District Court. *Murray*, 900 F.3d at 57, 63 ("More importantly, the bankruptcy court appropriately recognized the interest of the bankruptcy system, and thus the public interest, in preventing parties from exploiting the bankruptcy system for non-

bankruptcy-related reasons, especially when adequate remedies exist in state courts."). Allowing Tsaparas to abuse the bankruptcy system only serves to "divert the valuable resources and attention of specialized bankruptcy courts to matters intended to be addressed in state court—a result that is antithetical to the purpose of having a separate bankruptcy system in the first place." *Id.* Because this bankruptcy case serves no purpose for Tsaparas, his creditors, or the bankruptcy system, the Court should dismiss the case.

## V.    CONCLUSION

47.    For the foregoing reasons, Tsaparas' bankruptcy filing represents a bad faith attempt to evade his obligation to satisfy the Judgment and multiple District Court orders issued in the Underlying Litigation. Tsaparas' long history of dilatory tactics, procedural gamesmanship, and flat-out refusal to comply with District Court orders warrants dismissal under section 707(a). The Court should dismiss this bankruptcy case.

Respectfully submitted,


Dated: November 21, 2025

*/s/ Patrick R. Akers*
James T. Markus (25065)
Patrick R. Akers (54803)
MARKUS WILLIAMS YOUNG & HUNSICKER LLC
1775 Sherman Street, Suite 1950
Denver, Colorado 80203
(303) 830-0800
(303) 830-0809 (facsimile)
jmarkus@markuswilliams.com
pakers@markuswilliams.com

Daniel P. Jackson (IL 6289813)
Zachary J. Watters (IL 6310675)
VEDDER PRICE P.C.
222 North LaSalle Street
Chicago, Illinois 60601
(312) 609-7500
(312) 609-5005 (facsimile)
djackson@vedderprice.com
zwatters@vedderprice.com

*Counsel for NHC LLC*