## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | Case No. 25-16599-KHT |
| | ) | |
| SPYRIDON TSAPARAS, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |

### NHC LLC'S MOTION FOR RELIEF FROM AUTOMATIC STAY

NHC LLC ("NHC"), by and through undersigned counsel, moves (the "Motion") for relief from the automatic stay under section 362(d) of title 11 of the United States Code (the "Bankruptcy Code"),[1] and states as follows:

### I.    RELIEF REQUESTED

1.    NHC seeks stay relief for two reasons. First, NHC seeks stay relief to foreclose on certain Non-Exempt Personal Property (as defined below) for cause under section 362(d)(1) on the basis that such property is not adequately protected, this bankruptcy case is a bad-faith filing, and stay relief will benefit the estate. NHC also seeks relief under section 362(d)(2) because Spyridon Tsaparas ("Tsaparas") does not have equity in the Non-Exempt Personal Property, and such property is not necessary for an effective reorganization. Second, NHC seeks stay relief for cause under section 362(d)(1) to proceed with post-judgment collection and related proceedings presently pending in federal court on the basis that, again, this is a bad faith filing and because the federal court is intimately familiar with Tsarapas' failure to disclose and turnover his assets.

### II.    INTRODUCTION

2.    Since September 23, 2019, NHC and Spyridon Tsaparas ("Tsaparas") have been engaged in litigation in the United States District Court for the Northern District of Illinois (the

---

[1] Unless otherwise stated, all references to a chapter or section are to the Bankruptcy Code.

"District Court"), after NHC discovered that Tsaparas and the other Judgment Debtors[2] had committed fraud on, and essentially stolen millions of dollars from, NHC. *See NHC LLC v. Centaur Constr. Co.*, Case No. 19-cv-06332 (N.D. Ill. Sept. 23, 2019) (the "Underlying Litigation").

3.    Tsaparas' efforts to avoid complying with his obligations are well documented. United States District Court Judge Matthew F. Kennelly, the Judge presiding over the Underlying Litigation, has already found that Tsaparas has engaged in a deliberate strategy to "[s]tall, delay, [and] do nothing" in an effort to avoid complying with Judge Kennelly's orders and paying his obligation to NHC.[3] (Ex. 1 at 23:13–15.) Unfortunately, this finding is not unique. Judge Kennelly has repeatedly noted Tsaparas' failure to comply with court orders and questionable litigation tactics, including:

- refusing to produce documents in response to citations to discover assets and then objecting to the extension of the citations by improperly arguing "don't extend the citation because I didn't produce the thing that I was supposed to produce before."[4] (Ex. 2 at 38:2–8.)

- making legal arguments that are "not even borderline plausible[,]" "ridiculous[,]" "absurd[,]" and "frivolous, or nearly so."[5] (Ex. 3 at 5:14–19; Underlying Litigation, ECF No. 521 at 2.)

- presenting the same argument to the District Court "three and four times" in order to engage in "a strategy in this case to basically just keep papering the case and

---

[2] The term "Judgment Debtors" refers to Tsaparas, Peter Alexopoulos ("Alexopoulos"), and Centaur Construction Company Inc. ("Centaur").

[3] A true and correct copy of a portion of the transcript of the August 7, 2024 hearing in the Underlying Litigation is attached hereto as **Exhibit 1**.

[4] A true and correct copy of portions of the transcript of the December 20, 2023, hearing in the Underlying Litigation is attached hereto as **Exhibit 2**.

[5] A true and correct copy of portions of the transcript of the March 26, 2024, hearing in the Underlying Litigation is attached hereto as **Exhibit 3**.

keep filing stuff over and over again so that nothing ever happens." (Ex. 1 at 4:20–24.)

- making statements and advancing positions which literally cause the District Court to "laugh[] out loud" or are "facially absurd."[6] (Ex. 1 at 22:15–16; Ex. 4 at 12:5–10.)

- causing the District Court to reference, multiple times, the possibility that Tsaparas would be incarcerated based on failure to comply with District Court orders.[7] (Ex. 5 at 11:18–24, 18:23–25.)

4.      To be clear, NHC is not ***arguing*** that Tsaparas has engaged in a campaign of improper conduct, information concealment, and contemptuous disregard of court orders in a deliberate and calculated attempt to thwart NHC's collection efforts. Instead, NHC is ***stating facts***. The District Court has already found, among other things, that Tsaparas has "committed contempt of court *about three dozen times*" by systematically dissipating assets in violation of District Court orders. Moreover, the District Court has found that Tsaparas failed to provide NHC with required financial information to account where more than $1.2 million ***in cash withdrawals*** went to over the past several years.[8]

---

[6] A true and correct copy of portions of the transcript of the April 23, 2024, hearing in the Underlying Litigation is attached hereto as **Exhibit 4**.

[7] A true and correct copy of portions of the transcript of the September 30, 2024, hearing in the Underlying Litigation is attached hereto as **Exhibit 5**.

[8] A recent production of text messages between Tsaparas and a third-party underscores Tsaparas' open distain for the Underlying Litigation and his refusal to comply with the District Court's orders. In those text messages (attached hereto as **Group Exhibit 6**), Tsaparas accuses Judge Kennelly of doing things he is "not allowed to order by law" and entering "unlawful" and "illegal" orders against him. Tsaparas also has the audacity to accuse Judge Kennelly of being "compromised." Tsaparas' tirade against Judge Kennelly and his alleged improper rulings continued at the recent 341 meeting of creditors on November 12, 2025.  Tsaparas should not be permitted to utilize this bankruptcy case as another means of ignoring his obligations in the Underlying Litigation or in an apparent effort to forum-shop.

5.      This bankruptcy case is the latest effort by Tsaparas to avoid complying with, among other things, his payment and disclosure obligations in the Underlying Litigation, which are antithetical to the Bankruptcy Code. Contemporaneous with this Motion, the Debtor has filed a motion to dismiss the bankruptcy case. To the extent the Court does not dismiss this case, the Court should grant NHC stay relief to protect and foreclose on the Non-Exempt Personal Property, on which it has a perfected, first lien, and to proceed with post-judgment collection and related proceedings presently pending in the Underlying Action. There are ample bases to grant stay relief, including a lack of adequate protection and Tsaparas having no equity in the Non-Exempt Personal Property. Because this bankruptcy case is nothing more than an instrumentality for Tsaparas to continue hiding his assets and avoiding his disclosure obligations in the Underlying Litigation, the Court should grant the Motion.

## III.     JURISDICTION AND VENUE

6.      The Court has jurisdiction over the Bankruptcy Case pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (G).

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

8.      The predicates for the relief requested herein are section 362(d)(1) of the Bankruptcy Code, Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and L.B.R. 4001-1.

## IV.     SERVICEMEMBERS CIVIL RELIEF ACT

9.      Pursuant to L.B.R. 4001-1(a)(4) and 4002-3(c), Tsaparas is not in the military service. A copy of the Servicemembers Civil Relief Act Affidavit is attached at **Exhibit 21**.

## V.      FACTUAL BACKGROUND

### A.      The Underlying Litigation.

10.      Tsaparas and Alexopoulos were/are the principals of Centaur.[9] (Ex. 7 at 653:11–12.) In late 2017, NHC purchased the land on which the Nobu Hotel Chicago ("Nobu Hotel Project") was being developed. Centaur was ultimately retained as the general contractor. After NHC paid Centaur tens of millions of dollars to complete the Nobu Hotel Project, NHC learned that Judgment Debtors were engaged in a fraudulent scheme in which funds provided by NHC for the Nobu Hotel Project were used for other purposes.

11.      NHC's case was tried to a jury, and on August 18, 2022, the jury returned a verdict in favor of NHC with respect to the fraud count. (Underlying Litigation, ECF No. 208.) That same day, judgment was entered jointly and severally, in an aggregate total amount of $20,437,290.20, plus punitive damages against the Judgment Debtors individually, and in particular Tsaparas in the amount of $1,500,000.00. (*Id.*, ECF No. 209.) Thereafter, on March 15, 2023, the judgment (the "Judgment") was amended and increased to $22,272,124.34, in order to account for pre-judgment interest. (*Id.*, ECF No. 228.)[10] The Judgment has since been upheld on appeal. *See NHC LLC v. Centaur Constr. Co.*, No. 23-1719, 2025 WL 2717628 (7th Cir. Sept. 24, 2025). Since entry of the Judgment, NHC has been attempting to collect on that Judgment and Tsaparas has made every effort to avoid paying the Judgment or complying with District Court orders.

---

[9] A true and correct copy of portions of the August 16, 2022 (Volume 3-B), jury trial transcript in the Underlying Litigation is attached hereto as **Exhibit 7**.

[10] Critically, the Judgment is subject to nondischargeability under section 523.

**B.     NHC's Collection Efforts.**

**1.     NHC issues citations to discover assets.**

12.     In an attempt to collect the Judgment in the NHC Litigation, NHC has served numerous citations to discover assets under 735 ILCS 5/2-1402. NHC served direct citations (a post-judgment tool for Illinois judgment creditors enabling judgment creditors to engage a literal "fishing expedition" to gather information related to judgment debtors' current and/or historical assets) upon Tsaparas, Alexopoulos, and Centaur, and third-party citations upon (among several others) U.S. Bank, Busey Bank, and Village Bank & Trust. Notably, on May 5, 2023 (well over two years before Tsaparas' bankruptcy filing), NHC served a Citation to Discover Assets upon Tsaparas (the "Tsaparas Citation").[11] (Underlying Litigation, ECF No. 243.) The Tsaparas Citation (and the resulting lien created thereby) has been continued several times, most recently on October 20, 2025. (*Id.*, ECF No. 838.) Thus, the citations to the Judgment Debtors, and numerous third parties, remain in place.[12]

**2.     Tsaparas' *routine* violations of District Court Orders and citation restraining provisions on behalf of himself.**

13.     In the months following service of the Tsaparas Citation, Tsaparas made a partial production of responsive documents. Many of these documents were produced only after the District Court granted NHC's various motions to compel. (*See Id.*, ECF Nos. 295, 337.) Although Tsaparas' production was then incomplete, on March 5, 2024, NHC filed a motion for turnover order as to Tsaparas and US Bank Accounts (the "March Tsaparas Turnover Motion"). (*Id.*, ECF

---

[11] NHC also served a citation on Centaur (the "Centaur Citation"). (Underlying Litigation, ECF No. 309.)

[12] As a result, NHC has a perfected, first lien on all of Tsaparas' non-exempt personal property, which lien is superior to (and entitled to priority over) a chapter 7 trustee's lien on such property. *See infra* ¶¶ 45–46.

No. 351.) The March Tsaparas Turnover Motion outlined a multitude of instances in which Tsaparas had violated the restraining provision of the Tsaparas Citation. (*Id.* ¶¶ 16, 18.)

14.     On April 23, 2024, following briefing and a hearing on the March Tsaparas Turnover Motion, the District Court issued an oral ruling on the March Tsaparas Turnover Motion and found that "Tsaparas made numerous transfers in violation of the citation and the lien imposed by the citation. The total of those is in the neighborhood of $400,000." (Ex. 4, at 5:3–6.) The District Court further found that Tsaparas has "committed contempt of court about three dozen times" by systematically violating the restraining provision imposed by the Tsaparas Citation. (*Id.* at 8:1–2.)

15.     Following the April 23, 2024 ruling, NHC obtained additional documents in response to third-party citations. Based on a review of those documents, NHC learned that Tsaparas had continued to violate the restraining provisions of the Tsaparas Citation and the District Court's April 23, 2024, ruling by spending another $72,252.24 in just *two months*. (Underlying Litigation, ECF No. 592, ¶¶ 8–9.) The bulk of those funds were spent by Tsaparas on car leases, hotels, payments to his purported personal assistant, payments to his attorneys, and cash withdrawals. (*Id.*) During this time period and despite the existence of the Judgment and the restraining provision of the Tsaparas Citation, Tsaparas and his co-habitating domestic partner, Corri McFadden, own/owned multiple vehicles and resided in a 5,462 square foot mansion in Aspen, Colorado, with an estimated value of over $10 million.

16.     Based on this newly discovered information, on June 21, 2024, NHC filed another motion for rule to show cause as to why Tsaparas should not be held in contempt (the "June Tsaparas Contempt Motion"). (*Id.*, ECF No. 437.) Thereafter, on July 12, 2024, the District Court

entered its "Order Regarding Certain Post-Judgment Matters" (the "July 2024 Contempt Order").[13] (Ex. 8.) Among other things, in the July 2024 Contempt Order the District Court "found Spiro Tsaparas in contempt due to his repeated and extensive violations of the restraining provisions of the citation to discover assets that was served upon him." (*Id.*) Moreover, the District Court found that Tsaparas' arguments did not "make any sense" (*id.* at 11), "border[ed] on the ridiculous" (*id.* at 12), and were "[n]onsense" (*id.*). Judge Kennelly ultimately likened Tsaparas to a thief that was arguing "he's free to keep stealing because its [sic] not clear how much he will have to pay back and when." (*Id.*)[14] Additionally, the July 2024 Contempt Order required Tsaparas to make monthly installment payments of $25,000 to NHC, starting on July 30, 2024 and "to file with the Court . . . an accounting **under penalty of perjury** listing his monthly income and expenditures (including any payments on the judgment and on this installment order), as well as his assets at current market value[.]" (the "Monthly Accounting") (*Id.* at 3 (emphasis added).) Tsaparas' refusal to comply with District Court orders continued with respect to these obligations.

17.     With respect to his monthly installment payment obligation, Tsaparas made no payments.

18.     With respect to his Monthly Accounting obligation, Tsaparas engaged in further procedural gamesmanship. Specifically, Tsaparas either failed to timely file his Monthly Accountings *or* he filed incomplete Monthly Accountings which omitted various withdrawals Tsaparas made from his various bank accounts. (*See* Underlying Litigation, ECF No. 592, ¶¶ 16–

---

[13] A true and correct copy of the July 2024 Contempt Order is attached hereto as **Exhibit 8**.

[14] Moreover, it the May 15, 2025 Order, copy of which is attached hereto as **Exhibit 9**, Judge Kennelly found that Tsaparas has "continually shifted [his] factual statements concerning [his] assets and [has] failed to adequately supplement [his] document productions" and further questioned the veracity of numerous statements made, or positions adopted by, Tsaparas. (Ex. 9.)

23 (detailing the information Tsaparas omitted from his Monthly Accountings, made under the pains and penalties of perjury.) As the District Court found in its May 30, 2025, Memorandum Opinion and Order (the "May 2025 Tsaparas Contempt Order")[15]:

> When all of the unaccounted-for transfers are added up, it appears that Mr. Tsaparas has made, and **failed to disclose, more than $142,000 in personal cash withdrawals**. This is in addition to the undisclosed cash withdrawals that Mr. Tsaparas caused as principal of Centaur, which **total more than $1.2 million**.

(Ex. 10 at 5 (emphasis added).)

### 3. Tsaparas' *routine* violations of District Court Orders and citation restraining provisions on behalf of Centaur.

19.  The Centaur Citation required Tsaparas (acting on behalf of Centaur) to produce, *inter alia*, detailed financial information dating back five years. (*Id.*, ECF No. 309.) At various times, Centaur, Tsaparas, and/or Centaur's counsel claimed that Centaur ceased operations in 2019 and therefore had no responsive documents to produce after that date. In light of NHC's concerns that Centaur's document production was not complete, on or about April 24, 2024, the District Court ordered Centaur to provide a declaration of completeness. (*Id.*, ECF No. 389.)

20.  On May 10, 2024, Centaur simply reproduced all of the documents it had produced in response to discovery ahead of trial, but no new documents responsive to the Centaur Citation and nothing additional beyond 2019. Also on May 10, 2024, Centaur submitted a Declaration of Completeness signed under penalty of perjury by Tsaparas, attesting that these documents were "all of the documents within Centaur's possession and/or control that are responsive to the Citation to Discover Assets that was served on Centaur on November 28, 2023."[16] (Ex. 11.)

---

[15] A true and correct copy of the May 2025 Tsaparas Contempt Order is attached hereto as **Exhibit 10**.

[16] A true and correct copy of the Centaur Declaration of Completeness is attached as **Exhibit 11**.

21.     NHC would later confirm that Tsaparas' representations on behalf of Centaur were false. NHC obtained numerous documents from third-parties and through Freedom of Information Act requests which demonstrated that Centaur continued to operate years after 2019, through **at least** 2023. (Underlying Litigation, ECF No. 590, ¶¶ 4–41.) Again, this issue is not debatable, as the District Court in the Underlying Litigation has already found that Tsaparas' repeated representations that Centaur ceased operations and thus had no responsive documents, were false. Specifically, the District Court found:

- Tsaparas had shifted positions and no longer claimed that Centaur ceased operations after 2019[17] (Ex. 12 at 5);

- Instead, Tsaparas now claims that Centaur has no access to responsive documents, since it lost access to a Box.com server storing its responsive documents (*Id*);

- The "veracity" of Tsaparas' citation examination testimony, that Centaur lost access to the server storing its responsive documents, was no longer credible in light of the declaration of Deanna Van Senus, Tsaparas' personal assistant, in which Ms. Van Senus attests that Centaur had access to the Box.com server into 2024 (*Id*);

- Even if Tsaparas' testimony was credible, it would not explain why Centaur does not have access to documents created *after 2020* (*Id*. at 5–6); and

- Tsaparas and Centaur have "offered no explanation for why [Centaur] failed to produce any documents relating to [various] construction projects, many of which occurred after 2020." (*Id*. at 6.)

22.     Moreover, the scant amount of Centaur's bank records that have been produced reveal that during the period from January 1, 2020 (after Centaur supposedly stopped doing business) to November 30, 2024, **more than $9 million** flowed through Centaur's bank accounts. (*Id*., ECF No. 590, ¶ 47.) Additionally, between February 16, 2021 and February 24, 2023, Tsaparas and/or Centaur withdrew $1,271,157.38 **in cash** from Centaur's various bank accounts.

---

[17] A true and correct copy of the May 30, 2025, Memorandum Opinion and Order (the "May 2025 Centaur Contempt Order") is attached hereto as **Exhibit 12**.

(*Id.* ¶ 50.) Neither Centaur nor Tsaparas have produced any business records that would explain the nature of these transfers or their purpose.

23.     NHC has recently obtained access to the Box.com server which Tsaparas initially denied existed and then denied having access to. A review of the voluminous contents of the server is currently underway.

### 4.     Tsaparas' *routine* violations of District Court Orders and citation restraining provisions on behalf of Triton Marine Holdings LLC.

24.     Tsaparas and Alexopoulos have each confirmed that they were or are the sole owners of Triton Marine Holdings LLC ("Triton").[18] (Ex. 13 at 43:7–45:2; Ex. 14 at 50:19–53:2.) NHC, however, has never gotten a straight answer as to Triton's purpose.

25.     During his citation examination, Mark Hunt ("Hunt")[19] testified that Triton was an entity owned by Tsaparas and through which Tsaparas allegedly provided consulting services to M Development.[20] (Ex. 15 at 12:17–13:9.) Specifically, Hunt testified that Triton was hired for consulting services "with a handful of—of construction projects." (*Id.* at 13:9.) Hunt testified that in connection with those consulting services, Triton issued eleven invoices[21] (Group Ex. 16) to M Development and M Sourcing for a cumulative total of $211,538.47. (Ex. 15 at 19:17–20:1.)

---

[18] A true and correct copy of portions of Tsaparas' citation examination transcript is attached hereto as **Exhibit 13**. A true and correct copy of portions of Alexopoulos' citation examination transcript is attached hereto as **Exhibit 14**.

[19] Hunt is the principal of M Development, LLC ("M Development"), the original owner of the Nobu Hotel Project. Hunt and Tsaparas describe themselves as "dear friends" and call each other "brothers."

[20] A true and correct copy of portions of Hunt's citation examination transcript is attached hereto as **Exhibit 15**.

[21] True and correct copies of invoices issued by Triton to M Development or M Sourcing are attached hereto as **Group Exhibit 16**.

Curiously, all of these invoices were issued *after* the jury's verdict. NHC's analysis of bank records indicates that between December 2020 and November 2022, M Development paid Triton a total of $1,747,356.47.[22] (Ex. 17.)

26.     However, following Hunt's citation examination, Tsaparas gave drastically different testimony regarding the alleged purpose of Triton during his citation examination. According to Tsaparas, the "only purpose" of Triton was to own "a vessel that [Tsaparas and Alexopoulos] purchased in Greece." (Ex. 13 at 47:23–48:4.) Tsaparas clarified that Triton "was not in the construction business." (*Id*. at 48:16–18.) Likewise, at Alexopoulos' citation examination, he testified that Triton "did not have anything to do with construction." (Ex. 14 at 51:6–8.) Alexopoulos also testified that Triton was "an entity that was set up with the expectation of trying to explore opportunities in the hospitality sector in Greece." (*Id*. at 51:21–24.)

27.     Incredibly, Tsaparas testified that Hunt's attorneys came up with the idea to pay Tsaparas for work he was performing for M Development through Triton because of the fraud case against him.[23] (Ex. 18 at 64:23–65:11.) However, Hunt's testimony suggests it was Tsaparas' idea to use Triton for Tsaparas' consulting work for M Development. (Ex. 13 at 12:20–13:2.)

28.     In addition to the divergent stories regarding the role of Triton, it is also notable that in June 2022, Centaur began receiving monthly infusions of cash from Triton, with monthly deposits totaling as much as $438,151.00. This continued into February 2023. No documentation has been produced that would explain the nature of these payments.

---

[22] A summary of bank records indicating payments from M Development to Triton is attached hereto as **Exhibit 17**.

[23] A true and correct copy of portions of the January 8, 2025, hearing transcript in the Underlying Litigation is attached hereto as **Exhibit 18**.

29.     Moreover, M Development and Tsaparas have never explained why Triton, whether involved in the construction industry or not, was purportedly provided a more than $4.1 million dollar loan from M Sourcing LLC ("M Sourcing") (another entity purportedly owned by Hunt).[24] (Ex. 19.) Hunt testified that he has "gotten into kind of the bad habit of making a bunch of loans to [Tsaparas] over the years" (Ex. 15 at 13:10–25; 14:1–25; 15:1–16.) According to Hunt, the $4.1 million dollar loan to Triton is made up of those same "bunch of loans" he made to Tsaparas over the years. (*Id.*) In other words, the "loan" to Triton is, in reality, the formal documentation of numerous loans made to Tsaparas.

30.     Tsaparas has been and continues to actively repay the loans he received (and which were ultimately documented as a single sham loan to Triton) through his employment agreement with M Sourcing (the "Employment Agreement").[25] Included in the Employment Agreement, is a provision which provides that if Tsaparas remains an employee of M Sourcing for the duration of the Employment Agreement, the loan to "Triton" will be forgiven. (Ex. 20, ¶ 2.2.) In essence, the sham loan to Triton and the Employment Agreement operate to disguise Tsaparas' efforts to pay back Hunt/M Development/M Sourcing through work performed under the Employment Agreement. This arrangement was structured because of the Judgment and in an effort to place monies out of NHC's reach.

---

[24] A true and correct copy of an Amended and Restated Promissory Note between Triton and M Sourcing is attached hereto as **Exhibit 19**.

[25] A true and correct copy of the Employment Agreement between Tsaparas and M Sourcing is attached hereto as **Exhibit 20**.

### 5.    The District Court orders specific relief to address Tsaparas' misconduct.

31.    NHC filed multiple motions addressing Tsaparas' misconduct, both on behalf of himself and on behalf of Centaur. (Exs. 10, 12.) Following fulsome briefing, on May 30, 2025, the District Court ordered[26] the following relief:

- Tsaparas "must disclose and account for, by no later than 14 days from entry of this order, all cash transactions for himself and/or Centaur from January 1, 2019 to the present" (Ex. 10);

- Tsaparas "must turn over all cash withdrawn in violation of the citation since he was served with it, by no later than 14 days from entry of this order" (*Id.*);

- Tsaparas "must pay the balance of the judgment in monthly installments in the amount of at least $25,000" (*Id.*);

- Centaur must transfer to NHC "servers that may contain documents relating to Centaur's business operations or, if Centaur no longer has control or access to these servers, the production of information regarding where the servers are located and who controls them, and a grant of authority to NHC to access these servers" (Ex. 12);

- Centaur must provide "an accounting of all of Centaur's incoming and outgoing payments (including loans and repayments of debt) from January 1, 2020 to present" (*Id.*); and

- Centaur must pay "any amounts revealed in the newly produced documents and/or in the accounting to have been dissipated or improperly transferred" (*Id.*).

---

[26] In the May 2025 Tsaparas Contempt Order, Judge Kennelly found, among other things, that "Mr. Tsaparas' repeated unaccounted-for transfers blatantly disregarded the District Court's unambiguous commands" and that Tsaparas did not "attempt to justify—or even dispute—these violations." (Ex. 10 at 6.) The District Court went on to note that it has "given Mr. Tsaparas *multiple* opportunities to disclose his own assets. Yet Mr. Tsaparas has continually delayed filing financial disclosures and has omitted important transfers from these disclosures. These violations amount to contempt." (*Id.* at 7) (emphasis in original). The District Court further noted that Tsaparas' "transfers do not appear to be isolated" and that, "if anything. . . indicate a pattern in which Mr. Tsaparas transfers significant sums of money, delays his accounting disclosures, and then fails to disclose certain transfers on those accountings. Rather than isolated occurrences, these transfers are repeated violations of the citation's restraining provision and this Court's accounting order, and they amount to contempt of court." (*Id.* at 8.)

32.    To date, Tsaparas has failed to materially comply with the District Court's May 30, 2025 orders. Tsaparas has provided two unsupported excuses for his non-compliance. *First*, Tsaparas argued that he required access to the Box.com server which he previously claimed did not exist. (*Id*., ECF No. 786.) NHC provided Tsaparas a complete copy of all documents it obtained from Box.com on the week of September 15, 2025. (*Id*., ECF No.. 806.) *Second*, Tsaparas argued that his prior counsel was in possession of certain unidentified documents Tsaparas previously provided, but no longer retained copies of. (*Id*., ECF No. 786.) According to Tsaparas, he required copies of these documents in order to comply with the District Court's orders, but was unable to obtain the documents from his former counsel. (*Id*.) Unsurprisingly, Tsaparas' former counsel told a different story. According to counsel, Tsaparas never requested counsel provide documents to Tsaparas. (*Id*. ECF No. 800, ¶ 2.) However, in an abundance of caution, on or about September 8, 2025, counsel provided Tsaparas "with copies of all documents in its possession, custody, or control which were provided to it" by Tsaparas and several other entities related to Tsaparas. (*Id*. ¶ 5.) Despite receiving the documents he claimed to need in order to comply with the District Court's orders, Tsaparas has failed to provide a substantive accounting on his own behalf or on behalf of Centaur and has failed to turn over the voluminous amounts of cash he withdrew or make monthly installment payments. (*Id*., ECF No. 725.)

33.    On September 28, 2025, the District Court provided Tsaparas "until October 10, 2025 to complete the tasks required in the District Court's May 30, 2025 Orders." (*Id.*, ECF No. 820.)

34.    Instead of complying with the District Court's order, on October 10, 2025, and in yet another delay tactic, Tsaparas filed this bankruptcy case.

**C.      The Bankruptcy Case.**

35.      On October 10, 2025, Tsaparas filed a voluntary petition for relief under chapter 7. (*See* Docket No. 1.)

36.      Tsaparas did not schedule any real property, and scheduled only $13,625.75 worth of personal property. (*See id.* at 18–22.)

37.      Tsaparas claimed as exempt the following personal property: 2002 BMW Sedan M5, iPhone, two pistols and one shotgun, clothes, costume jewelry/beads, and certain portions of U.S. Bank account x8753. (*See id.* at 23–24.) All personal property other than this exempt property is collectively referred to as the "Non-Exempt Personal Property."

38.      Tsaparas incorrectly scheduled NHC as holding a non-priority, unsecured claim in the amount of 22,272,124.00, the basis of which is a "judgment/business debt." (*See id.* at 31.)

39.      As of the petition date, NHC has a ***secured*** claim against the estate in the amount of $26,780,773.60, which comprises $23,772,174.34 under the final, non-appealable Judgment and $3,134,533.70 in post-judgment interest less $125,934.44 in payments. An itemization of these amounts is attached at **Exhibit 22**. (*See* Fed. R. Bankr. P. 3001(c)(2)(A).) The claim is secured by the Non-Exempt Personal Property under Illinois law by virtue of filing a Citation to Discover Assets. (*See* 735 ILCS 5/2-1402; Underlying Litigation ECF Nos. 243, 838; *infra* ¶¶ 45–46.) The amount necessary to satisfy the Judgment against Tsaparas as of the petition date is $26,780,773.60. (*See* Fed. R. Bankr. P. 3001(c)(2)(B).)

## VI.    LAW AND ARGUMENT

**A.      Legal Standard.**

40.      Upon the filing of a voluntary petition, the Bankruptcy Code imposes an automatic stay against "the commencement . . . of a judicial, administrative, or other action or proceeding

against the debtor" and "the enforcement, against the debtor or against the property of the estate, of a judgment obtained before the commencement of the case." 11 U.S.C. § 362(a)(1), (2).

41.     Under section 362(d)(1), "the court shall grant relief from the [automatic] stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest." "'Cause' is an intentionally broad and flexible concept which must be determined on a case-by-case basis." *In re Project Orange Assocs., LLC*, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010) (citation omitted); *see also Pursifull v. Eakin*, 814 F.2d 1501, 1506 (10th Cir. 1987). In addition to lack of adequate protection, a debtor's bad faith in filing a bankruptcy case can constitute cause for relief from the automatic stay. *See In re Lewis*, No. 23-12555 TBM, No. 23-12555 TBM, 2024 WL 845947, at \*11 (Bankr. D. Colo. Feb. 28, 2024) (citing *Udall v. FDIC (In re Nursery Land Dev., Inc.*), 91 F.3d 1414 (10th Cir. 1996)).

42.     Under section 362(d)(2), "the court shall grant relief from the [automatic] stay . . . with respect to a stay of an action against property . . . if . . . (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization."

43.     Here, NHC seeks stay relief to (a) foreclose on the Non-Exempt Personal Property and (b) to proceed with post-judgment collection and related proceedings presently pending in the District Court.

**B.      Cause Exists to Foreclose on the Non-Exempt Personal Property and to Proceed with Post-Judgment Collection and Related Proceedings in the District Court.**

44.     Under section 362(d)(1), "[t]he moving party has the burden to show that cause exists to lift the stay, after which the burden shifts to a debtor to demonstrate why the stay should remain in place." *In re Jim's Maint. & Sons, Inc.*, 418 F. App'x 726, 728 (10th Cir. 2011).

### 1. Cause exists because the Non-Exempt Personal Property is not adequately protected.

45.     As an initial matter, NHC has a first lien on the Non-Exempt Personal Property. NHC's service of the Tsaparas Citation (and other citations) grants NHC a superior lien in Tsaparas' assets. "A citation [served] upon the judgment debtor grants the judgment creditor an enforceable lien 'upon all personal property belonging to the judgment debtor in possession or control of the judgment debtor.'" *NHC LLC*, No. 19 C 6332, 2025 WL 1075198, at *3 (quoting 735 ILCS 5/2-1402(m)(1)). Illinois law explicitly provides that such lien "binds nonexempt personal property, including money, choses in action, and effects of the judgment debtor." 735 ILCS 5/2-1402. The same section also grants a judgement creditor a lien on property "which may thereafter be acquired or come due to the judgment debtor." *Id*. 735 ILCS 5/2-1402, which is construed liberally, vests courts "with broad powers to compel the application of discovered assets or income to satisfy a judgment" and the related procedures are "largely to the judge's discretion." *Yancheng Shanda Yuanfeng Equity Inv. P'ship v. Wan*, No. 20-2198, 2024 WL 2876920, at *4 (C.D. Ill. Apr. 24, 2024), *report and recommendation adopted in part*, 2024 WL 4468812 (C.D. Ill. Oct. 10, 2024) (citations omitted); *see also NHC LLC*, 2025 WL 1075198, at *3–4 (entering turnover order in favor of judgment creditor and against third party citation respondent that received money from judgment debtor after judgment debtor was served with citation); *NHC LLC v. Centaur Constr. Co.*, No. 19 C 6332, 2025 WL 1547264, at *3–5 (N.D. Ill. May 30, 2025) (directing citation respondent to turn over cash used in violation of citation as a civil contempt penalty).

46.     A judgment creditor's prepetition service of a citation to discover assets upon a debtor provides that judgment creditor with a ***perfected lien*** on all the debtor's non-exempt personal property, which lien is superior to (and entitled to priority over) a chapter 7 trustee's lien

on such property. *See, e.g., In re Porayko*, No. 09 B 29262, 2010 WL 1253949, 2010 WL 1253949, at \*6 ("It is now clear under Illinois law that service of a citation to discover assets created a perfected lien on all of the debtor's non-exempt personal property as of the service date." (citing *Cacok v. Covington*, 111 F.3d 52, 54 (7th Cir. 1997)), *aff'd sub nom. Crane v. Porayko*, No. 10-cv-2630, 2012 WL 2702997 (N.D. Ill. July 3, 2012), *aff'd sub nom. In re Porayko*, 705 F.3d 703 (7th Cir. 2013).

47.     NHC maintains that Tsaparas did not disclose all of his Non-Exempt Personal Property, which includes more than $1.2 million in cash withdrawals. Because Tsaparas has failed to disclose such property—or transfers of the same—the Non-Exempt Personal Property is at risk of dissipation or, to the extent such property requires insurance, being uninsured by the estate, both of which constitute a lack of adequate protection. *See In re Carson*, 30 B.R. 637, 642 (Bankr. D. Kan. 1983) (stating "impending dissipation may constitute a lack of adequate protection in and of itself"); *In re Gonzales, No. 21-11384-j13*, 2022 Bankr. LEXIS 3455, at \*21 (Bankr. D.N.M. Dec. 7, 2022) ("[A] lack of insurance can also establish that a creditor lacks adequate protection." (citation omitted)). Because Tsaparas is concealing NHC's collateral, and that collateral is at risk of dissipation, there is a lack of adequate protection warranting stay relief.

## 2.     Cause exists because the bankruptcy case is a bad-faith filing.

48.     A debtor's bad faith in filing a bankruptcy case can constitute cause for stay relief under section 362(d)(1). *See Lewis*, 2024 WL 845947, at \*11; *see also In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1310 (2d Cir. 1997) (stating bad faith filing for bankruptcy constitutes "cause" warranting stay relief); *Pacific Rim Invs., LLP v. Oriam, LLC (In re Pacific Rim Invs., LLP)*, 243 B.R. 768, 771–72 (D. Colo. 2000) (stating "bad faith" filing constitutes "cause' for termination of the automatic stay under § 362(d)(1)").

49.     A finding of bad faith is "based on a conglomerate of factors rather than on any single event." *In re Gunnison Ctr. Apts., LP*, 320 B.R. 391, 399 (Bankr. D. Colo. 2005). "The totality of the circumstances of a case encompasses, among other things, how the parties have conducted themselves, their good or bad faith, and their motives. Good faith is an intrinsic and integral component of the bankruptcy process." *J E Livestock, Inc. v. Wells Fargo Bank, N.A. (In re J E Livestock, Inc.)*, 375 B.R. 892 (B.A.P. 10th Cir. 2007) (affirming finding of cause to grant relief from automatic stay) (citation omitted).

50.     This bankruptcy case, initiated ***more than two and a half years*** after entry of the Judgment and on the same date Tsaparas was ordered to make payments and provide fulsome accountings to NHC, was filed in bad faith. Because there are numerous indicia of Tsaparas' bad faith in filing this bankruptcy case, cause exists to foreclose on the Non-Exempt Personal Property and to proceed with post-judgment collection and related proceedings pending in the District Court.

51.     Tsaparas' prepetition conduct evidences his bad faith. Tsaparas' misconduct and bad faith in the Underlying Litigation are well documented. (*See supra* ¶¶ 3, 12–31.) In violation of the Tsaparas Citation's restraining provisions and numerous orders from the District Court, Tsaparas: (i) unlawfully withdrew millions in cash from his personal and Centaur bank accounts (Ex. 4 at 5:3–6; Underlying Litigation, ECF No. 592, ¶¶ 8–9; Ex. 10 at 5); (ii) improperly spent tens of thousands of dollars on car leases, hotels, payments to his purported personal assistant, and payments to his attorneys (Underlying Litigation, ECF No. 592, ¶¶ 8–9); (iii) committed dozens of instances of contempt of court (Ex. 4 at 8:1–2); (iv) failed to produce business records related to the transfers identified above (Ex. 12 at 5); (v) refused to provide accurate and fulsome accountings of his monthly income and expenses (Ex. 10 at 5); and (vi) entered into an improper

20

arrangement to repay loans through an artificially reduced salary (Ex. 15 at 13:10–15:16; Ex. 20, ¶ 2.2). Tsaparas' prepetition conduct amounts to nothing more than unlawful and improper violations of restraining provisions and court orders, which were intended to avoid his obligations to NHC. Such bad faith conduct constitutes cause to grant the Motion. *Cf. Marrama v. Citizens Bank*, 549 U.S. 365, 373 (2007) ("Bankruptcy courts . . . routinely treat dismissal for prepetition bad-faith conduct as implicitly authorized by the words 'for cause.'").

52.      The timing of this bankruptcy case evidences bad faith. The timing of this bankruptcy case was strategically engineered to permit Tsaparas to further delay complying with his District Court-ordered obligations in the Underlying Litigation. *See In re Springs Hospitality, Inc.*, No. 06-13331 HRT, 2006 Bankr. LEXIS 1804, at *26 (Bankr. D. Colo. Aug. 22, 2006) (analyzing whether "the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights"). This bankruptcy case was not filed in response to a sudden financial disaster. Rather, Tsaparas filed this bankruptcy case as a last-ditch effort and in order to delay NHC's collection efforts and to avoid disclosing what Tsaparas has done with millions of dollars in assets, which he has not done in his statements despite having an obligation to do so under penalty of perjury. (*See* Docket No. 1.) Tsaparas' use of this bankruptcy case to further his dilatory tactics evidence his bad faith. *Cf. In re Glunk*, 342 B.R. 717, 737 (Bankr. E.D. Pa. 2006) (analyzing whether debtor filed bankruptcy case as a dilatory tactic to thwart trial).

53.      As further evidence of delay and dilatory tactics, this bankruptcy case serves no purpose. Tsaparas will receive no benefit from this chapter 7 case, nor will he obtain what every chapter 7 covets: a discharge. *See* 11 U.S.C.§ 727(b). Following a jury trial, NHC obtained the Judgment based on Tsaparas' fraud and willful conduct. (*See* Underlying Litigations, ECF Nos.

208, 209.) Because the elements of actual fraud are "virtually identical" to the elements of fraud under section 523(a)(2)(A), the preclusive effect of the Judgment will almost certainly result in a nondischargeable debt. (*See Martin v. Hauck (In re Hauck)*, 489 B.R. 208, 213 (D. Colo. 2013); *Newman v. Donnell (In re Donnell)*, Ch. 7 Case No. 10-12517 ABC, Adv. No. 10-1372 ABC, 2011 Bankr. LEXIS 2266, at *6 (Bankr. D. Colo. June 7, 2011) ("Because elements of common law fraud liability under state law are virtually identical to the elements of fraud under § 523(a)(2)(A) of the Bankruptcy Code, proof of the underlying debt is often coincident with proof of nondischargeability under § 523(a)(2)(A)."); *see also hemp Recovery Co. v. Boyd (In re Boyd)*, Ch. 13 Case No. 22-12455 TBM, Adv. No. 22-1258 TBM, 2023 Bankr. LEXIS 1724, at *32–36 (Bankr. D. Colo. July 10, 2023).) Tsaparas scheduled NHC as holding a claim for $22,272,124.00, which represents 92.8% of all claims. (Docket No. 1 at 31, 33.) *See Springs Hospitality, Inc.*, 2006 Bankr. LEXIS 1804, at *10 (analyzing whether "the debtor has few unsecured creditors whose claims are relatively small compared to the claims of the secured creditors"). Tsaparas cannot discharge the bulk of his debts—more than $22.2 million[27]—in this bankruptcy case, thus defeating the purpose of filing for chapter 7 in the first place: "to provide an honest debtor with a fresh start." *In re Asset Resolution Corp.*, 552 B.R. 856, 862 (Bankr. D. Kan. 2016) (citation omitted).

54.   <u>This is a two-party dispute</u>. Bankruptcy courts are loath to wade into two-party disputes. *See Springs Hospitality, Inc.*, 2006 Bankr. LEXIS 1804, at *26 ("Generally, a court should not take jurisdiction over a two-party dispute, unless special circumstances exist." (citation omitted)). Here, this bankruptcy case is nothing more than an extension of the Underlying

---

[27] NHC disputes the amount of the Judgment contained in Tsaparas' schedule. The amount necessary to satisfy the Judgment against Tsaparas as of the petition date is $26,780,773.60. *See supra* ¶ 39.

Litigation. As discussed above, NHC is, by far, Tsaparas' largest creditor, and Tsaparas filed this bankruptcy case in an effort to prevent complying with the May 30, 2025 Orders. The District Court has routinely ruled against Tsaparas, and Tsaparas has expressed his discontent with Judge Kennelly, calling him "compromised" and claiming he has entered "unlawful" and "illegal" orders. (*See* Ex. 6.) The Court should not allow Tsaparas to engage in such flagrant forum shopping. *See In re Cattron*, 647 B.R. 186, 190 (Bankr. E.D. Mich. 2022) ("It is obvious that the Debtor filed this bankruptcy case in order to try to obtain a different court and judge from the ones in the Arizona Probate Case, after the Arizona court had made very unfavorable partial rulings on the merits against the Debtor. This instance of forum shopping is impermissible, and should not be allowed to succeed.").

55.      After a jury found Tsaparas liable for fraud, Tsaparas spent the next two-and-a-half years evading NHC's collection efforts. On the eve of having to provide a substantive accounting of his assets and to turn over certain Non-Exempt Personal Property—the same things Tsaparas was required to do in this bankruptcy case—Tsaparas filed for bankruptcy. *See Asset Resolution*, 552 B.R. at 862 (stating debtor must "hand[] over to a trustee all of [his] non-exempt assets for liquidation for the benefit of the debtor's creditors"); *EarthSnap, Inc.*, 670 B.R. 49, 57 (Bankr. E.D. Tex. 2025) (stating the bankruptcy system is "premised on transparency"). Tsaparas has no desire to obtain a fresh start; if he wanted one, Tsaparas would have made these disclosures and turned over his Non-Exempt Personal Property. Nor can Tsaparas obtain a discharge of more than $22 million, as NHC's claim is subject to nondischargeability. Tsaparas initiated this action for the sole purpose of delay and to engage in impermissible forum shopping. Because this bankruptcy case was filed in bad faith, cause exists to grant the Motion.

### 3. Cause exists because NHC's actions will benefit the estate.

56.     Again, "cause" is "an intentionally broad and flexible concept which must be determined on a case-by-case basis." *Project Orange Assocs.*, 432 B.R. at 103. Here, cause exists because stay relief will benefit the estate. NHC has a perfected, first lien on the Non-Exempt Personal Property. *See supra* ¶¶ 45–46. By allowing NHC to foreclose on the Non-Exempt Personal Property, NHC can reduce the amount of its claim with funds unavailable to other creditors (i.e., NHC's collateral), thus reducing the amount of any unsecured deficiency claim. *See* 11 U.S.C. § 502(a). As a result, if the Trustee recovers avoidance actions or other unencumbered assets, there will be more available to other creditors. Stay relief will also prevent the estate from wasting resources liquidating assets for the benefit of NHC. Additionally, allowing NHC to obtain the substantive accounting of Tsaparas' assets in the Underlying Action is quicker, cheaper, and better suited to take place before the District Court. *See infra* section V.B.4. Accordingly, because the requested stay relief will allow NHC to obtain discovery and reduce its claim with encumbered assets for the benefit of other creditors and the estate, cause exists to grant the Motion.

### 4. Cause exists to continue proceedings in the District Court.

57.     "Whenever a party seeks relief from the automatic stay 'for cause,' under 11 U.S.C. § 362(d)(1), in order to continue proceedings in another court, it is appropriate to follow the Curtis factors . . . to guide the Court's analysis," which are set forth below:

1. Whether the relief will result in a partial or complete resolution of the issues.

2. The lack of any connection with or interference with the bankruptcy case.

3. Whether the foreign proceeding involves the debtor as a fiduciary.

4. Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases.

5. Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation.

6. Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question.

7. Whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties.

8. Whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c).

9. Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f).

10. The interest of judicial economy and the expeditious and economic determination of litigation for the parties.

11. Whether the foreign proceedings have progressed to the point where the parties are prepared for trial.

12. The impact of the stay on the parties and the "balance of hurt."

*Baack v. Horizon Womens Care Prof'l LLC (In re Horizon Womens Care Prof'l LLC)*, 506 B.R. 553, 557–58 (Bankr. D. Colo. 2014) (quoting *In re Curtis*, 40 B.R. 795, 799–800 (Bankr. D. Utah 1984)).

58.     Here, the *Curtis* factors weigh heavily in favor of granting the Motion.

59.     <u>Resolution of the issues</u>. The District Could has already substantively ruled against Tsaparas, and since May 30, 2025, the District Court has held hearings and issued post-judgment orders related to the Non-Exempt Personal Property and other non-debtor assets. After numerous failures complying with the May 30, 2025 Orders, Tsaparas was required to "complete the tasks required in the District Court's May 30, 2025 Orders" no later than October 10, 2025, the date on which Tsaparas filed for bankruptcy. The District Court is best positioned to resolve Tsaparas' continued issues with disclosure and turnover. This factor weighs heavily in favor of granting the Motion.

60.     <u>Lack of connection or interference with the bankruptcy case</u>. The requested stay relief will have no adverse impact on this bankruptcy case. If anything, it will serve to benefit the

estate, because any information made available in the Underlying Action will be available to the Trustee and parties in interest in this bankruptcy case. *See supra* ¶ 56. This factor weighs heavily in favor of granting the Motion.

61.    <u>Debtor as a fiduciary</u>. This factor is inapplicable.

62.    <u>Specialized tribunal better suited to determine the issues</u>. The Underlying Action is before a federal district court. "While this is not a specialized tribunal, the Judge has been handing the case from the start." *Danzik*, 549 B.R. at 809. The District Court is intimately "familiar and experience with . . . the parties involved[] and the facts of the [Underlying Action]," as evidenced by the fact that the parties and the District Court have been actively engaged in post-judgment collections for more than two-and-a-half years. This factor weighs in favor of granting the Motion.

63.    <u>Costs to litigate borne by insurance carrier</u>. This factor is inapplicable.

64.    <u>Third party liability and debtor functions as a bailee or conduit</u>. This factor is inapplicable.

65.    <u>Whether the Litigation Prejudices the Interests of Other Creditors</u>. Creditors will not be harmed by NHC seeking information on and turnover of the Non-Exempt Personal Property. First, NHC has a secured claim against the Non-Exempt Personal Property. Because the Non-Exempt Personal Property cannot be used to satisfy unsecured claims, such creditors are not prejudiced by NHC taking action with respect to its collateral. If anything, other creditors will benefit by NHC reducing the amount of any unsecured deficiency claim. *See supra* ¶ 56. Second, to the extent NHC obtain information related to Tsaparas' assets which are unencumbered by NHC's lien, creditors will benefit from such information, as the Trustee can liquidate those assets for the benefit of all creditors. This factor weighs in favor of granting the Motion.

66.    <u>Equitable Subordination</u>. This factor is inapplicable.

67.    Avoidable Lien. This factor is inapplicable.

68.    Judicial Economy and Expeditious Determination of the Issues. The District Court, which has been involved with the parties and underlying facts for more than six years, is best able to resolve the issues pending before it, and the District Court's "steps necessary to finalize these matters are minimal when compared to the resources that this Court and parties would expend re-litigating the issues." *Danzik*, 549 B.R. at 810. Moreover, "when there are multiple parties involved in the nonbankruptcy litigation, considerations of judicial economy may support the return of the litigation to the non-bankruptcy forum." *In re Chan*, 355 B.R. 494, 501 (Bankr. E.D. Pa. 2006). *See also In re Melly*, No. 18-26036-RG, 2019 Bankr. LEXIS 1383, at *11 (Bankr. D.N.J. Apr. 29, 2019) (same); *In re Yaffe*, 58 B.R. 26, 26 (Bankr. D.D.C. 1986) (granting relief from the automatic stay to permit state court to proceed to judgment in case that involved multiple parties and claims). In addition to NHC and Tsaparas, the District Court involves numerous other parties, including Alexopoulos, Centaur, Hunt, M Development, M Sourcing, and Triton. This factor weighs in favor of granting the Motion.

69.    Preparation of State Court Action for Trial. Although the District Could has already substantively ruled against Tsaparas, Tsaparas filed for bankruptcy on the very day he was required to provide an accounting of his assets and to turn over certain Non-Exempt Personal Property. To the extent stay relief is granted and Tsaparas fails to comply with the requirements of the May 30, 2025 Orders, the District Court is best situated to resolve the dispute between the parties. This factor weighs in favor of granting the Motion.

70.    The Balance of Hurt. The Court must balance the financial hardship to NHC with the financial hardship to Tsaparas. *See Danzik*, 549 B.R. at 810. Here, the very information that Tsaparas must disclose in the Underlying Action is the same information he must disclose pursuant

to Bankruptcy Rule 2004. Additionally, Tsaparas must turn over the Non-Exempt Personal Property to either the Trustee or NHC (if the Court grants this Motion or the Trustee abandons such property). To the extent Tsaparas takes issue with these obligations, the issues must be resolved, and the District Court is best positioned to resolve those issues. The Underlying Action is six years old, and post-judgment collection issues have been ongoing for more than two-and-a-half years. By resolving these issues in the District Court, Tsaparas can spend the least amount of post-petition funds doing what he is obligated to do: provide information on and turn over the Non-Exempt Personal Property and any other unencumbered property. This factor weighs in favor of granting the Motion.

71.     Because the *Curtis* factors overwhelming weigh in favor of NHC, the Court should allow NHC to proceed with post-judgment collections and related proceedings in the District Court.

**C.     Stay Relief Is Appropriate Because the Estate Does Not Have Equity in the Non-Exempt Personal Property.**

72.     Under section 362(d)(2), the moving party has the burden of proof on the debtor's equity in property. *See* 11 U.S.C. § 362(g)(1). Once that burden is met, the non-moving party has the burden to show that the property is necessary to an effective reorganization. *See id.* § 362(g)(2).

73.     Here, the estate does not have any equity in the Non-Exempt Personal Property. Based on Tsaparas' schedules and statements, the value of the Non-Exempt Personal Property is $0.00. (*See* Docket No. 1.) However, NHC has a secured claim in the amount of $26,780,773.60. (*See supra* ¶ 39.) The estate does not have any equity in the Non-Exempt Personal Property.[28]

---

[28] For the avoidance of doubt, to the extent NHC recovers more from foreclosing on the Non-Exempt Personal Property than the value of its allowed claim, NHC shall turn over such funds to the Trustee.

74.     Furthermore, the Non-Exempt Personal Property is not necessary to an effective reorganization, because Tsaparas is not reorganizing, but liquidating under chapter 7. (*See* Docket.) Accordingly, the Court must grant stay relief to foreclose on the Non-Exempt Personal Property under section 362(d)(2).

### D.     Tsaparas Lacks Standing to Object to NHC Seeking Stay Relief to Foreclose on the Non-Exempt Personal Property.

75.     It is well-settled that the commencement of a bankruptcy proceeding creates a bankruptcy estate that includes all property in which the debtor has a legal or equitable interest as of the commencement of the case. *See* 11 U.S.C. § 541(a). As a result, "[a]ll rights held by a debtor in the property are extinguished, unless the property is exempted from the estate under 11 U.S.C. § 522 or abandoned back to the debtor under 11 U.S.C. § 554." *In re Hopkins*, 346 B.R. 294, 303 (Bankr. E.D.N.Y. 2006); *see also Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004) ("Once an asset becomes part of the bankruptcy estate, all rights held by the debtor in the asset are extinguished unless the asset is abandoned back to the debtor pursuant to § 554 of the Bankruptcy Code.").

76.     A debtor generally lacks standing to oppose a motion for relief from stay where the motion seeks relief against estate property. *See Arroyo v. Scotiabank de Puerto Rico (In re Arroyo)*, 489 B.R. 486, 488 (B.A.P. 1st Cir. 2013); *In re Sindram*, No. 08-00559, 2009 WL 361470, at *2 (Bankr. D. D.C. Feb. 6, 2009) ("[T]he debtor has no standing to oppose the lifting of the automatic stay with respect to acts against property of the estate."); *c.f. In re Caffey*, No. 13-31259, 2014 WL 3888318 (Bankr. N.D. Ohio Aug. 8, 2014) (holding bankruptcy court erred in awarding damages, including attorneys' fees, to debtors under section 362(k), where debtors had no ownership interest in the property at issue, because it was property of the estate). Here, the lifting of the automatic stay will not impact Tsaparas, as it only will affect NHC's ability to exercise its superior lien rights

with respect to property of the estate. Accordingly, Tsaparas does not have standing to object to NHC seeking stay relief to foreclose on the Non-Exempt Personal Property.

77.     NHC requests that the Court waive the fourteen-day stay requirement pursuant to Bankruptcy Rule 4001(a)(3), which will allow NHC to expeditiously obtain the substantive accounting of Tsaparas' assets and to retrieve the Non-Exempt Personal Property, which is at serious risk of dissipation.

WHEREFORE, NHC respectfully requests that the Court grant the Motion and any other relief as the Court deems just and proper.

Respectfully submitted,


Dated: November 21, 2025          */s/ Patrick R. Akers*
                                  James T. Markus (25065)
                                  Patrick R. Akers (54803)
                                  MARKUS WILLIAMS YOUNG & HUNSICKER LLC
                                  1775 Sherman Street, Suite 1950
                                  Denver, Colorado 80203
                                  (303) 830-0800
                                  (303) 830-0809 (facsimile)
                                  jmarkus@markuswilliams.com
                                  pakers@markuswilliams.com

                                  Daniel P. Jackson (IL 6289813)
                                  Zachary J. Watters (IL 6310675)
                                  VEDDER PRICE P.C.
                                  222 North LaSalle Street
                                  Chicago, IL 60601
                                  (312) 609-7500
                                  (312) 609-5005 (facsimile)
                                  djackson@vedderprice.com
                                  zwatters@vedderprice.com

                                  *Counsel for NHC LLC*